**ATLAS POWDER COMPANY,**
Plaintiff,

and

Hanex Products, Inc., Plaintiff–
Appellant,

v.

**IRECO INCORPORATED and
ICI Explosives USA, Inc.,**
Defendants–Appellees.

No. 99–1041.

United States Court of Appeals,
Federal Circuit.

Sept. 7, 1999.

Stanford B. Owen, Fabian & Clendenin, Salt Lake City, Utah, argued, for plaintiff-appellant, Hanex Products, Inc. With him on the brief were W. Cullen Battle, Robert A. Garda, Jr., and Jon C. Martinson.

Gordon L. Roberts, Parsons Behle & Latimer, Salt Lake City, Utah, argued, for defendant-appellee, IRECO Incorporated and ICI Explosives USA, Inc. Of counsel on the brief was C. Kevin Speirs.

Before MAYER, Chief Judge, MICHEL and RADER, Circuit Judges.

RADER, Circuit Judge.

The United States District Court for the District of Wyoming determined that U.S. Patent No. 4,111,727 (the Clay patent) and its reissue, U.S. Patent No. RE 33,788 (the reissue patent) were invalid. Atlas Powder Company (Atlas), a licensee under those patents, sued IRECO Incorporated (IRECO) for infringement of the Clay patent. Following two bench trials, the district court concluded that both the original Clay patent and the reissue patent were invalid as anticipated by either U.S. Patent No. 3,161,551 (Egly) or U.K. Patent No. 1,306,546 (Butterworth). Because the district court correctly interpreted the claims and applied the law of anticipation, this court affirms the finding of invalidity.

I.

The Clay patent and its reissue both claim explosive compositions. To deto-

nate, explosives require both fuel and oxidizers. The oxidizer rapidly reacts with the fuel to produce expanding gases and heat – an explosion. Composite explosives mix various sources of fuel and oxygen. The most widely used and economical composite explosive is ammonium nitrate and fuel oil (ANFO). ANFO explosives mix about 94% by weight of ammonium nitrate (AN), the oxidizer, with 6% by weight of fuel oil (FO). The AN may include porous prills, dense prills, Stengel flakes, or crystalline AN. ANFO explosives have two primary disadvantages. First, wet conditions dissolve the AN and make the explosive unusable in damp settings. Second, ANFO is a relatively weak explosive because interstitial air occupies considerable space in the mixture, thereby decreasing the amount of explosive material per unit of volume.

To address these shortcomings, explosive experts developed water-in-oil emulsions. These emulsions dissolved the oxidizer into water and then dispersed the solution in oil. Because oil surrounds the oxidizer, it is resistant to moisture, thus solving one of the problems with ANFO. Emulsions also increased the explosive's bulk strength by increasing the density of explosive material in the mixture. Emulsions, however, also have a disadvantage. Emulsions will not detonate unless sensitized. Sensitivity of a blasting composition refers to the ease of igniting its explosion. Experts generally sensitize emulsions by using gassing agents or adding microballoons throughout the mixture. The gassing agents or microballoons provide tiny gas or air bubbles throughout the mixture. Upon detonation, the gas pockets compress and heat up, thereby igniting the fuel around them. In other words, the tiny gas or air bubbles act as "hot spots" to propagate the explosion.

The Clay patent and its reissue both claim composite explosives made from the combination of an ANFO blasting composi-

tion and an unsensitized water-in-oil emulsion. Both patents claim essentially the same blasting composition. Claim one of the reissue patent recites:

> 1. A blasting composition consisting essentially of 10 to 40% by weight of a greasy water-in-oil emulsion and 60 to 90% of a substantially undissolved particulate solid oxidizer salt constituent, wherein the emulsion comprises about 3 to 15% by weight of water, about 2 to 15% of oil, 70 to 90% of powerful oxidizer salt comprising ammonium nitrate which may include other powerful oxidizer salts, wherein the solid constituent comprises ammonium nitrate and *in which sufficient aeration is entrapped to enhance sensitivity to a substantial degree,* and wherein the emulsion component is emulsified by inclusion of 0.1 to 5% by weight, based on the total composition, of an [oil-in-water] water-in-oil emulsifier to hold the aqueous content in the disperse or internal phase.

(Underline added.)

When this lawsuit began, Atlas was the exclusive licensee under the Clay patent in the continental U.S. and Hawaii. Atlas commenced this lawsuit against IRECO in 1986, alleging infringement of the Clay patent. During the course of litigation, Dr. Robert Clay, the inventor, filed a reissue petition with the United States Patent and Trademark Office (PTO). Atlas then moved to stay the litigation pending resolution of the reissue application. The district court denied that motion and conducted a first bench trial on the issues of validity and infringement of the Clay patent in October 1986. Dr. Clay then requested suspension of prosecution of the reissue application by the PTO in February 1987. After waiting several years for a decision from the district court, Dr. Clay requested that the PTO reinstate the reissue proceedings in 1990. In January 1992, the Clay reissue patent issued upon surrender of the original patent. Later that

year, the district court rendered its findings and judgment regarding the validity and infringement of the Clay patent.

In its 1992 judgment, the district court found claims 1, 2, 3, 10, 12, 13, and 14 of the Clay patent invalid as anticipated by either one of two prior art references, Egly or Butterworth. Egly and Butterworth each disclose blasting compositions containing a water-in-oil emulsion and ANFO with ingredients identical to those of the Clay patents in overlapping amounts. The following chart illustrates the overlap between the explosive compositions disclosed in the prior art patents and the Clay reissue patent:

|  | Clay | Egly | Butterworth |
|---|---|---|---|
| **Composition contents:** |  |  |  |
| Water-in-oil Emulsion | 10–40% | 20–67% | 30–50% |
| Solid Ammonium Nitrate | 60–90% | 33–80% | 50–70% |
| **Emulsion contents:** |  |  |  |
| Ammonium Nitrate | 70–90% | 50–70% | 65–85% |
| Water | about 3–15% | about 15-about 35% | 7–27% |
| Fuel Oil | about 2–15% | about 5-about 20% | 2–27% |
| Emulsifier | 0.1–5% | about 1–5% | 0.5–15% |

The only element of the Clay patent claims which is arguably not present in the prior art compositions is "sufficient aeration ... entrapped to enhance sensitivity to a substantial degree." The trial court determined that "sufficient aeration" was an inherent element in the prior art blasting compositions within the overlapping ranges. The district court also found that none of the accused products infringed any of the asserted claims. The 1992 judgment was not final, however, and specifically reserved a decision on the effect of the reissue patent for phase two of the case.

On September 22, 1993, the district court granted Hanex Products Inc.'s (Hanex) motion to intervene in the lawsuit. Hanex owns the two patents and had licensed them to Atlas. Hanex asserted the same claim of patent infringement against IRECO that Atlas had asserted, but also initiated a declaratory judgment action against ICI Explosives USA, Inc. (ICI), Atlas' successor-in-interest, seeking the sole right to control the litigation. In July 1994, the district court granted declaratory relief in favor of Hanex, against ICI, giving Hanex the sole right to control and direct the litigation on the two patents.

After the reissue patent issued, the district court conducted a second bench trial, in January 1996, on the issues of phase two. Specifically, the district court considered whether reissue affected its 1992 judgment. On September 25, 1998, the district court rendered its final judgment finding claims 1, 2, 3, 10, 12, 13, and 14 of the Clay reissue patent invalid as anticipated and finding that IRECO had not infringed any of the asserted claims. Despite the PTO's consideration of the Egly and Butterworth references during prosecution of the reissue, the district court concluded that IRECO had overcome the Clay reissue patent's presumption of validity under 35 U.S.C. § 282 (1994) by clear and convincing evidence. The district court noted that IRECO presented a great deal of testimonial and documentary evidence on inherent disclosures of the prior art that was not before the PTO in the

reissue proceeding. Hanex appealed to this court from the 1998 final judgment.

## II.

■ This court reviews claim construction as a matter of law. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451, 46 USPQ2d 1169, 1173 (Fed.Cir. 1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (en banc). Anticipation is a question of fact, including whether or not an element is inherent in the prior art. *See In re Schreiber*, 128 F.3d 1473, 1477, 44 USPQ2d 1429, 1431 (Fed.Cir.1997). Therefore, this court reviews a finding of anticipation under the clearly erroneous standard. *See Gechter v. Davidson*, 116 F.3d 1454, 1457, 43 USPQ2d 1030, 1032 (Fed.Cir.1997).

■ "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d at 1477. Anticipation of a patent claim requires a finding that the claim at issue "reads on" a prior art reference. *See Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781, 227 USPQ 773, 778 (Fed.Cir. 1985). In other words, if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art. *See id.* at 781. Specifically, when a patent claims a chemical composition in terms of ranges of elements, any single prior art reference that falls within each of the ranges anticipates the claim. *See id.* at 780–82 ("It is also an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art."). In chemical compounds, a single prior art species within the patent's claimed genus reads on the generic claim and anticipates. *See In re Gosteli*, 872 F.2d 1008, 1010, 10 USPQ2d 1614, 1616 (Fed.Cir.1989).

■ As noted previously, both Egly and Butterworth disclose blasting compositions with ingredients identical to those of the Clay patent and its reissue in overlapping amounts. The only element which is arguably missing from the prior art is the requirement that "sufficient aeration [be] entrapped to enhance sensitivity to a substantial degree." To decide the issue of anticipation, therefore, the district court examined whether "sufficient aeration . . . to enhance sensitivity" was inherently part of the prior art compositions. That decision, in turn, required the trial court to interpret the claim term "sufficient aeration." By looking at the express language of the claims and the patent's written description, the district court concluded that the claim term "sufficient aeration" included both interstitial air (between oxidizer particles) and porous air (within the pores of oxidizer particles).

The first task of this court on appeal is to construe independently the disputed claim term. This question requires this court to determine whether the claim term "sufficient aeration" includes porous air, as the trial court determined. The claim term "sufficient aeration" does not limit the air content of the composition to interstitial air. Rather, the broad term "aeration" contains no qualitative limits on the kind of air exposure, only the quantitative limit that the air exposure be "sufficient" to enhance sensitivity. If the inventor intended "sufficient aeration" to carry qualitative limits, he also did not express that intention in the patent's written description. The specification gives no explicit definition of the phrase "sufficient aeration . . . to enhance sensitivity," which appears in the patent for the first time in the claims.

It is, of course, possible that the inventor did not include qualitative limits on the term "sufficient aeration" in the specification because those of ordinary skill in the art understand that only interstitial air enhances sensitivity and satisfies the claim's language. *See Autogiro Co. of Am. v. U.S.*, 181 Ct.Cl. 55, 384 F.2d 391, 397, 155 USPQ 697 (Ct.Cl.1967) ("Claims cannot be clear and unambiguous on their face."); *Markman*, 52 F.3d at 986 ("[T]he focus in construing disputed terms in claim language is ... on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."). The trial record, however, shows that those of ordinary skill in this art at the time the patent application was filed knew that both interstitial and porous air enhance sensitivity. Dr. Clay himself, the inventor of the patents in suit, testified that air from any source would contribute to the explosion of a heavy ANFO composition and, particularly, air trapped within the pores of porous prilled AN. Therefore, this court detects no error in the district court's conclusion that "sufficient aeration ... to enhance sensitivity" is understood by those of ordinary skill in the art to include both interstitial and porous air. The district court appropriately construed the claims at issue to include aeration from both sources.

### III.

■ Based on its correct interpretation of "sufficient aeration," the district court heard evidence on whether both interstitial and porous air were present and enhanced sensitivity in the prior art explosive compositions. Based on the evidence, the district court concluded that IRECO had shown the inherency of the disputed claim element in the prior art and overcome "the presumption of validity under 35 U.S.C. § 282 by providing clear and convincing evidence of invalidity." This court must determine whether the district court committed clear error by determining that the evidence clearly and convincingly established that "sufficient aeration ... to enhance sensitivity" was inherent in either Egly or Butterworth.

■ To invalidate a patent by anticipation, a prior art reference normally needs to disclose each and every limitation of the claim. *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369, 21 USPQ2d 1321, 1328 (Fed.Cir.1991). However, a prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it. *See id.*; *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 630, 2 USPQ2d 1051, 1053 (Fed.Cir.1987). Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates. *See In re King*, 801 F.2d 1324, 1326, 231 USPQ 136, 138 (Fed.Cir. 1986). Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. *See Titanium Metals*, 778 F.2d at 780. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art. *See id.* at 782. However, the discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer. *See id.* at 782 ("Congress has not seen fit to permit the patenting of an old [composition], known to others ..., by one who has discovered its ... useful properties."); *Verdegaal Bros.*, 814 F.2d at 633.

This court's decision in *Titanium Metals* illustrates these principles. *See Titanium Metals*, 778 F.2d at 775. In *Titanium Metals*, the patent applicants sought a patent for a titanium alloy containing various ranges of nickel, molybdenum, iron, and

titanium. The claims also required that the alloy be "characterized by good corrosion resistance in hot brine environments." *Titanium Metals,* 778 F.2d at 776. A prior art reference disclosed a titanium alloy falling within the claimed ranges, but did not disclose any corrosion-resistant properties. This court affirmed a decision of the PTO Board of Appeals finding the claimed invention unpatentable as anticipated. This court concluded that the claimed alloy was not novel, noting that "it is immaterial, on the issue of their novelty, what inherent properties the alloys have or whether these applicants discovered certain inherent properties." *Id.* at 782. This same reasoning holds true when it is not a property, but an ingredient, which is inherently contained in the prior art. The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate. The doctrine of anticipation by inherency, among other doctrines, enforces that basic principle.

The trial record contains exhaustive evidence regarding the inherency of both interstitial and porous air in the Egly and Butterworth compositions within the overlapping ranges. The testimony from expert witnesses for both parties established that whether sufficient air is present in the explosive composition to facilitate detonation is a function of the ratio of the emulsion to the solid constituent. Dr. Clay testified that "if you mix porous prills, for example, with 30% typical water-in-oil emulsions, you're going to have air in there and it will detonate." Another of Atlas' experts testified that a mixture of 30% of either an Egly or a Butterworth emulsion, mixed with 70% standard fertilizer grade porous AN would have interstitial air, assuming nothing was done to disturb the size distribution of the AN prills. The other experts agreed that the emulsions

described in both Egly and Butterworth would inevitably and inherently have interstitial air remaining in the mixture up to a ratio of approximately 40% emulsion to 60% solid constituent. The expert testimony supports the district court's conclusion that "sufficient aeration" is inherent in both Egly and Butterworth.

The district court also relied on evidence from several tests which showed that "sufficient aeration ... to enhance sensitivity" was inherently present within the overlapping ranges of the Clay patents and Egly and Butterworth. In tests conducted with porous prilled AN combined with FO, stable detonations were obtained in every 8" diameter bore hole test where the percentage of emulsion ranged from 30% to 42.5%. Butterworth specifically discloses the use of porous prilled AN. Butterworth, p. 3, ll. 35–50. These tests, therefore, support the finding that "[t]he emulsions described by Butterworth, combined with the ratios of ANFO disclosed by Butterworth, would inevitably and inherently have interstitial air remaining up to approximately 40% emulsion." The district court also found that the solid AN disclosed in Egly would have included porous prills. These tests, therefore, further support the court's finding that "emulsions described in the Egly Patent, combined with either AN or ANFO, would inevitably and inherently have interstitial air remaining in the mixture up to approximately 40% emulsion to 60% solid constituent." This court discerns no clear error in the district court's conclusion that "sufficient aeration" was inherent in each anticipating prior art reference.

█ Because "sufficient aeration" was inherent in the prior art, it is irrelevant that the prior art did not recognize the key aspect of Dr. Clay's alleged invention – that air may act as the sole sensitizer of the explosive composition. An inherent structure, composition, or function is not

necessarily known. *See, e.g., In re King,* 801 F.2d at 1327; *Titanium Metals,* 778 F.2d at 782. Once it is recognized that interstitial and porous air were inherent elements of the prior art compositions, the assertion that air may act as a sole sensitizer amounts to no more than a claim to the discovery of an inherent property of the prior art, not the addition of a novel element. Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation. *See Titanium Metals,* 778 F.2d at 782. In addition, there was evidence that Butterworth did recognize the functioning of interstitial and porous air in sensitizing the composition. Butterworth recognizes the need for a gaseous sensitizer. Butterworth, p. 2, ll. 38–56. It teaches that the "sensitizer may be a gaseous sensitizer present in the composition in the form of gas bubbles or discrete particles containing an entrapped gas such as air." *Id.,* p. 2, ll. 41–45. Although this typically suggests use of a gassing agent or microballoons, Butterworth expressly recognizes that in certain ranges (i.e., 50% to 70% by weight of ANFO) the mixture of porous prilled AN and FO alone provides the necessary sensitization. *See id.,* p. 3, ll. 37–50. The district court found that Butterworth thus inherently appreciates that interstitial and porous air may serve as the necessary sensitizer. This court discerns no clear error in that finding.

In reaching this judgment, this court notes that Egly teaches away from air entrapment. Specifically, Egly teaches that it is desirable to "fill all spaces in between each particle to give added density." Egly, col. 1, ll. 26–27. This statement in Egly, however, does not defeat the district court's finding of anticipation for several reasons. First, Egly's teaching does not in any way discredit the trial court's alternative reliance on Butterworth for invalidation of the Clay patent and its reissue. More important, the statement in

Egly is, in fact, only a showing that Egly did not recognize the function of the inherently present interstitial air. As noted previously, an insufficient scientific understanding does not defeat a showing of inherency. In fact, even in Egly itself, the only way taught for removing interstitial air is the addition of more emulsion. *See id.,* col. 1, ll. 50–55. Egly, however, teaches the use of a broad range – between 20% and 67% by weight – of water-in-oil emulsion. *See id.,* col. 3, ll. 21–24. While Egly compositions containing amounts approaching 67% by weight of water-in-oil emulsions may have little or no entrapped air, the evidence established that at emulsion levels below 40%, Egly compositions "inevitably and inherently" trap sufficient amounts of air to enhance sensitivity. This evidence included both substantial amounts of expert testimony and data showing extensive testing of Egly compositions.

Finally, although the record showed that special mixing techniques – such as grinding and screening the AN particles – remove interstitial air from the blasting compositions, Egly did not teach or suggest any such techniques. Thus, although Egly may have suggested removal of air, it nonetheless inherently contained interstitial aeration sufficient to enhance sensitivity when comprised of elements within the Clay patent ranges. Consequently, this court discerns no clear error in the district court's conclusion that Egly compositions within the range of the Clay patent claims inherently contain sufficient air to enhance sensitivity.

Based upon all the evidence, substantial amounts of which were not before the PTO in its reissue examination, the district court concluded that IRECO had proven

> clearly and convincingly that, unless extraordinary measures are taken to grind and screen ammonium nitrate, the existence of "interstitial air," or suffi-

cient aeration to sustain a stable detonation, is a function of the ratios of emulsion to solid constituent. Specifically, at ratios of 30% emulsion and 70% solid constituent, which are common to the Clay Patent, the Egly Patent, and the Butterworth Patent, there is inherently sufficient aeration to sustain a stable detonation, barring extraordinary efforts to grind and screen the ammonium nitrate used in the solid constituent.

This court discerns no clear error in the district court's factual determination that the prior art inherently possesses sufficient aeration to enhance sensitivity to a substantial degree within the overlapping ranges. Nor does this court discern clear error in the district court's finding of anticipation based on either Egly or Butterworth. To uphold the Clay patent and its reissue would preclude the public from practicing the prior art.

### III.

In conclusion, this court affirms the district court's finding of invalidity with respect to claims 1, 2, 3, 10, 12, 13, and 14 of the Clay patent and the Clay reissue patent. This court therefore does not address the district court's additional finding of non-infringement.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*