**FLO–CON SYSTEMS, INC., Plaintiff,**

v.

**LECO CORPORATION, Defendant.**

Civ. A. No. CV193–028.

United States District Court,
S.D. Georgia,
Augusta Division.

May 11, 1993.

Edward L. Speese, Warlick, Tritt & Stebbins, Augusta, GA, Gail Duffie Stebbins, Martinez, GA, for Flo–Con Systems, Inc.

Ted Hamby Clarkson, Joseph Hixon Huff, Kilpatrick & Cody, Augusta, GA, for Leco Corp.

## ORDER

BOWEN, District Judge.

Before the Court is Plaintiff Flo–Con Systems, Inc.'s, ("Flo–Con") Motion for a Preliminary Injunction, filed pursuant to 35 U.S.C. § 283.  Flo–Con seeks to enjoin Leco Corporation's ("Leco") continued manufacture, use, promotion, and sale of three Leco products that allegedly infringe on Flo–Con patents.  The parties presented their argu-

ments at the April 27, 1993, hearing on this matter. For the reasons stated below, Flo–Con is granted limited relief through the requirement that Leco deposit into the registry of the Court a percentage of its gross sales of specified products.

## I. BACKGROUND

Flo–Con, a company involved in the research, development, and manufacture of steel industry equipment, filed this action against Leco to enforce two patents: U.S. Patent 4,545,512—originally issued October 8, 1985, (the "Original '512 patent") and reissued January 12, 1993, after reexamination and modification ("the '512 patent")—and U.S. Patent 5,174,908 ("the '908 patent"). The allegedly infringing Leco products are three versions of a tundish valve slide gate.

A tundish valve slide gate is a component of a valve used to control the flow of molten steel in a four container, continuous casting, steel manufacturing system. The four component containers are (1) the furnace, (2) the ladle, (3) the tundish, and (4) the mold. When the system is in operation, molten steel flows from the furnace, through the ladle and tundish, and into the mold. The valves used to control the flow from the tundish to the mold employs a rectangular metal plate, known as a slide gate, through which a hole is bored. To open the valve, the slide gate hole is aligned with the valve's opening; similarly, the valve is closed by sliding the gate until its solid portion is aligned with the valve's opening. Also, because the slide plates wear quickly, they must be replaced approximately every six to eight hours of operation.

Flo–Con's '512 patent and its '908 patent describe slide gates designed for use in the Flo–Con 11T Tundish Valve. The distinguishing feature of the gate described in the '512 patent ("the '512 gate") is that its hole is offset from the plate's center a distance greater than the radius of the hole. According to Flo–Con, an offset hole is advantageous because it allows the valve operator to throttle the flow of molten steel; that is, he is not limited to on and off only.

The gate described in the '908 patent ("the '908 gate") is an advanced version of the '512 gate whose distinguishing feature is asymmetrical ledges that prevent it from being inserted into the tundish valve backwards. Because of that feature, the '908 gate is known as a nonreversible gate.[1] One problem with the '512 gate is that if it is inserted backwards, the full-on and full-off positions are reversed. Thus, if an operator selects emergency shut-off and the '512 gate in the valve is installed backwards, the valve goes to full open instead of closed. To remedy this problem, the '908 gate employs asymmetrical ledges on its sides (the gate has shoulders that slide on rails in the valve) so that the gate can be inserted into the valve only one way.

According to Flo–Con, three slide gates manufactured and sold by Leco infringe on its patents. The first is virtually identical to the Flo–Con '512 gate and allegedly infringes on the '512 patent. Each of the two remaining Leco gates allegedly infringe on both the '512 and '908 patents because they employ an offset hole like that found in the '512 gate and an asymmetrical guide feature similar to that found in the '908 gate. The distinction between the two Leco nonreversible gates, however, is that one has asymmetrical ledges like those used on the '908 gate while the other has ledges of equal width and a groove cut into one ledge.

## II. ANALYSIS

Injunctive relief may be granted in patent cases "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The standard for granting preliminary injunctions under § 283 is no different than that applicable in other cases, *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987)—it requires analysis of the usual four factors: (1) reasonable likelihood of success on the merits, (2) irreparable harm, (3) the balance of hardships between the parties, and (4) the injunction's impact on the public interest, *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451

1. The '512 gate, on the other hand, is known as a    reversible gate.

(Fed.Cir.1988). Significantly, none of these four factors are dispositive, each must be weighed against the others and against the relief requested. *Id.*[2] Applying these factors, Flo–Con is entitled to limited relief as to Leco's reversible and nonreversible tundish slide gates.

## A. Likelihood of Success on the Merits

### 1. Leco's Reversible Gate

Flo–Con asserts that the Leco reversible gate is a direct copy of the '512 gate. Leco counters with three arguments to show Flo–Con likely will not succeed on the merits concerning its '512 patent: (1) that there is no infringement of the '512 patent, (2) that the '512 patent is invalid, and (3) that the '512 patent is unenforceable. Despite these arguments, however, Flo–Con probably will succeed in showing the Leco reversible gate infringes on its '512 patent.

■■■ Leco admits that its reversible gate directly infringes if the '512 gate is covered separately by the '512 patent; however, it denies infringement by arguing the '512 patent covers only the valve-gate combination and that, under the repair doctrine, consumable parts of a patented item may be copied if the consumable parts are not patented separately.[3] Leco explains that, by also describing a sequential valve, the preamble to claims one through four of the reexamined '512 patent ("Preamble") limits the '512 patent's coverage to a valve/gate combination.[4] The relevant portion of the Preamble provides as follows:

> A gate operative in valve apparatus in which apertured gates are conveyed sequentially along a longitudinally extending guide structure into and out of flow controlling relation with the pour opening of a teeming vessel and wherein, in order to adjustably position said gates with respect to said pour opening for flow throttling purposes, said guide structure is movable transversely of the direction of movement of said gates along said guide structure, said gate comprising. . . .

As interpreted by Leco, that language renders the valve an essential element of claims one through four such that they cover only devices that include all components of both the described valve and the gate.

Although not entirely clear from its presentation, Leco apparently gives considerable weight to the fact that the preamble to claims one through four of the Original '512 patent included the phrase "of the type" such that it read as follows: "A gate operative in valve apparatus *of the type* in which apertured gates are conveyed sequentially. . . ." (emphasis supplied). Again reading its arguments broadly, Leco's position seems to offer that the phrase "of the type" was deleted during reexamination of the '512 patent to make the sequential valve an essential ele-

**2.** Although the case-law is somewhat confused on the issue, as a general rule, Federal Circuit law rather than regional circuit law governs the issuance of injunctions under § 283. *Hybritech, Inc.,* 849 F.2d at 1451 n. 12 (the issuance of preliminary injunctions under § 283 is a procedural matter, but Federal Circuit precedent governs because "it involves substantive matters unique to patent law"). There is an exception to this general rule, however—regional circuit law governs purely procedural questions concerning the issuance of patent injunctions. *Id.*

**3.** Stated broadly, the repair doctrine allows use of non-licensed parts to repair patented items so long as the part replaced is not separately patented. *See generally Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360, 1375–76 (Fed.Cir.1991); *Porter v. Farmers Supply Serv., Inc.,* 790 F.2d 882, 885–86 (Fed.Cir.1986).

**4.** Claim one of the reexamined '512 patent is:
A gate operative in valve apparatus in which apertured gates are conveyed sequentially along a longitudinally extending guide structure into and out of flow controlling relation with the pour opening of a teeming vessel and wherein, in order to adjustably position said gates with respect to said pour opening for flow throttling purposes, said guide structure is movable transversely of the direction of movement of said gates along said guide structure, said gate comprising:
(a) a generally rectangular refractory body having through opening defining a teeming orifice therein;
(b) means forming shoulders extending parallel to the longitudinal axis of said refractory body for engagement with said guide structure; and
(c) said teeming orifice being disposed on a lateral axis of said refractory body in offset relation to said longitudinally axis, the extent of offset being in excess of the radius of said teeming orifice.

ment of that patent and thereby avoid reciprocal valve prior art.

The '512 patent's reexamination history, however, suggests Flo–Con probably will be able to show the allegedly limiting language simply describes the type valves in which '512 gates are used. One of the principal questions before the Patent and Trademark Office ("PTO") during reexamination of the '512 patent was whether offset holes in reciprocal valve slide gates qualified as prior art that warranted rejection of the '512 patent's first four claims. After reexamining the '512 patent against the cited reciprocal valve prior art and after a post-rejection interview with counsel for the patentee, the PTO examiner stated:

> The Examiner's position is that, while allowable matter may be disclosed, the presence in the claims of the words "of the type" creates a possible ambiguity that prevents distinct claiming of the invention. Deletion of these words from the claims would remove the possible indefiniteness and resultant ambiguity to enable the preamble to give life and meaning to the body of the claims and thus render them allowable. The Examiner's *does not [sic] consider such a change would alter the effective scope of the claims 1 to 4, as granted, but does correct a drafting error and thus, renders the claims more precise.*

Examiner Interview Record, Serial No. 90/002359 (June 6, 1991) ('512 patent reexamination file history) (emphasis supplied). Contrary to Leco's allegations, these comments suggest that the impact of deleting the words "of the type" was only minor and did not change the entire scope of the relevant claim's coverage. Furthermore, as noted by Flo–Con, throughout the three hundred seventy-four pages of reexamination documents Flo–Con consistently referred to the '512 patent as covering the '512 gate only and not the valve/gate combination. In short, while Leco's interpretation is plausible, Flo–Con's interpretation is more consistent with the PTO examiner's and Flo–Con's pre-litigation treatment of the Preamble.

▮▮▮▮ Like its non-infringement arguments, Leco's claims concerning invalidity and unenforceability are unpersuasive. Under 35 U.S.C. § 282, patents are presumed valid, and parties challenging a patent's validity have the burden of proving invalidity by clear and convincing evidence. *Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). Significantly, however, the § 282 presumption is a procedural device that affects the burdens of proof only—it does not affect substantive law. *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir. 1985). *See also New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed.Cir.1992) (in preliminary injunction context, the § 282 presumption of validity does not relieve the patentee's burden of showing likelihood of success on the merits as to validity).[5]

▮▮▮▮ Leco asserts that the '512 patent is invalid because of similar reciprocal valve prior art that, like the '512 patent, used an offset hole to allow for flow adjustment. While Leco correctly points out that the § 282 presumption of validity is simply a procedural device that cannot be "strengthened" by reexamination and reissuance of a patent, reexamination and reissuance may be evidence in support of validity. *See Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985) (recognizing PTO examiner's findings are to be given due consideration; noting that reissuance "strengthens" evidence concerning validity). The PTO's reexamination and reissuance of the '512 patent is evidence in support of validity here because it specifically considered the prior art Leco claims invalidates the '512 patent. Although Leco argues the PTO was mislead by Flo–Con during the reexamination proceedings, as discussed more fully below, it fails to support that allegation sufficiently. Consequently, it ap-

---

5. As explained in *New England Braiding Co.:*
[T]he presumption of validity is not evidence which can be "weighed" in determining likelihood of success. The presumption acts as a procedural device which places the burden of

going forward with evidence and the ultimate burden of persuasion of validity at trial on the alleged infringer.
*New England Braiding Co.,* 970 F.2d at 882.

pears Leco likely will not be able to show that the '512 patent is invalid.

Similarly, Leco's claims that the '512 patent is unenforceable probably will not succeed on the merits. To establish inequitable conduct, a patentee must be shown by clear and convincing evidence to have failed to disclose material information or submitted false material information with the intent to deceive. *Kingsdown Medical Consultants Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988). When considering inequitable conduct allegations a two-step analysis is used: (1) a determination is made as to whether the withheld references satisfy a threshold level of materiality and whether there is a threshold showing of intent to deceive and (2) materiality and intent are balanced against one another—"[t]he more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co. v. Schlumberger Tech Corp.*, 925 F.2d 1435, 1439 (Fed.Cir.1991).

Leco asserts that the '512 patent is unenforceable because Flo–Con engaged in inequitable conduct (1) by failing to disclose relevant reciprocal valve prior art during the original examination of the '512 patent and (2) by submitting a "misleading" declaration during reexamination of that patent. With respect to Leco's first allegation—that Flo–Con failed to cite relevant prior art—Leco's evidence of that prior art's materiality and of Flo–Con's intent to deceive is minimal. It is true that during reexamination the PTO considered the prior art Leco cites and, based at least partially on that prior art, initially rejected the '512 patent. The PTO's subsequent decision to reissue the '512 patent (after only minor changes to the patent's language), however, renders the initial rejection less significant. Without more, these circumstances suggest only a minimal degree of materiality.

In its attempt to show Flo–Con intended to deceive the PTO when it failed to cite the allegedly relevant prior art, Leco simply alleges that counsel involved in the application proceeding knew of the prior art. Leco offers nothing further in support. While intent to deceive generally must be inferred from the circumstances surrounding the applicant's conduct, *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed.Cir.1989), Leco's conclusory allegations concerning intent to deceive are insufficient. Thus, as to Flo–Con's failure to cite the allegedly relevant prior art in its original application, the minimal showing of materiality and intent to deceive suggest that failure does not render the '512 patent unenforceable.

Based on the evidence presented to date, Leco's arguments concerning a misleading declaration filed during reexamination also have a low likelihood of success on the merits. The allegedly misleading declaration filed during reexamination explains that combining the flow control techniques previously found in reciprocal valve technology with sequential valve technology is not obvious to one skilled in the art. Leco disagrees and argues that this declaration is misleading because it fails to note that the distinctions between reciprocal and sequential valves have no effect on the offset hole flow control technique at issue here. Significantly, however, Leco did not offer sufficient evidentiary support for its claim that combination of the two technologies was obvious. While this question will be reviewed in full on the merits, the evidence presented here suggests the '512 patent is enforceable.

### 2. Leco's Nonreversible Gates

Flo–Con seeks injunctive relief against two Leco nonreversible gates—one that is virtually identical to its '908 gate ("Flo–Con type") and another that uses an offset hole like that described in the '512 patent but that is nonreversible because of a groove cut into one ledge (as opposed to the asymmetrical ledges used on the '908 gate) ("Groove type"). Three questions arise when considering Flo–Con's likelihood of success as to these two gates: (1) whether use of an offset hole in the two nonreversible gates infringes on the '512 patent, (2) whether use of asymmetrical ledges on the Flo–Con type nonreversible gate infringes on the '908 patent, and (3) whether use of an asymmetrical groove in the Groove type nonreversible gate infringes on the '908 patent. Also to be addressed is Leco's alternative argument that, even if its

gates infringe on the '908 patent, Flo–Con is unlikely to succeed on the merits because the '908 patent is unenforceable. As explained more fully below, although Flo–Con has a high likelihood of showing Leco's two reversible gates infringe on its '512 patent and that Leco's Flo–Con type nonreversible gate infringes on its '908 patent, it probably will not succeed in showing that the Groove type nonreversible gate infringes on the '908 patent.

Leco's nonreversible gates, which use an offset hole in the same way its reversible gates do, likely infringe on the '512 patent for the reasons set forth in the discussion above concerning Leco's reversible gates. Also, the Flo–Con type nonreversible gate probably infringes on the '908 patent because it is virtually identical to the Flo–Con '908 gate— it is a rectangular gate with a hole offset from the gate's center and asymmetrical ledges that allow it to be placed in the tundish valve only one way. Consequently, Flo–Con likely will succeed in showing that both of the Leco nonreversible gates infringe on its '512 patent and in showing that Leco's Flo–Con type nonreversible gate also infringes on its '908 patent.

■ Concerning the Leco Groove type nonreversible gate, however, Flo–Con's likelihood of showing infringement on the '908 patent is much lower. Flo–Con recognizes the obvious distinction between the asymmetrical ledges used in its '908 gate and the groove used in the Leco gate but goes on to argue that its '908 patent embraces any type of asymmetry—whether achieved through asymmetrical widths, thicknesses, or grooves. Although Flo–Con correctly notes that claim one of the '908 patent simply describes "ledges in asymmetrical configuration," the PTO examiner's comments concerning the Verel Patent U.S. No. 5,011,050 ("Verel '050 patent") cast doubt on that argument's strength.[6] During examination of the '908 patent, Flo–Con attempted to provoke an interference [7] with the Verel '050 patent. In rejecting that attempt, the PTO examiner explained:

> Applicant's request for an interference is noted but not persuasive since, 1) no claims have yet been allowed, and 2) [t]he Applicant's invention is not the same as that claimed in Verel. Verel claims an asymmetrical *thickness* of the plate ... while applicant claims and discloses only an asymmetrical *width* of the guide "ledge[.]" An interference is only declared when the claims are directed to the *same* invention.

PTO Examiner's Action, Serial No. 07/693,-915 (Feb. 14, 1992) ('908 patent file history) (emphasis in original). The implication of these comments is that the '908 patent covers only gates with ledges of different widths and does not embrace all asymmetrical edges. Although it attempts to dismiss the PTO examiner's comments by noting the physical differences between the edge thickness asymmetry of the Verel '050 patent and the groove in the Leco gate, Flo–Con has not shown that its '908 patent covers more than gates with different ledge widths. Consequently, its likelihood of showing Leco's Groove type nonreversible gate infringes on the '908 patent is low.

■ As an additional argument, Leco maintains that the '908 patent is invalid for failing to define the term "ledge." *See* 35 U.S.C. § 112 (inventions must be described in such clear and concise terms that one skilled in the relevant art could reproduce the invention). According to Leco, "it is not clear whether the 'ledge' of the ['908 patent] claims includes the frame and the ceramic, or just the ceramic, or just the frame." As noted above, patents are presumed valid, 35 U.S.C. § 282, and challengers bear the burden of showing invalidity by clear and convincing evidence. *See Jones,* 727 F.2d at 1528. Leco's five sentences of conclusory allegations on this point are not likely to

6. The Verel '050 patent is similar to the '908 patent because it also describes a gate with asymmetrical edges. The distinction between the two, however, is that the Verel '050 describes a gate with edges of different thicknesses—as op-

posed to the different edge/ledge widths used in the '908 gate.

7. An interference is a legal contest to determine who is the first inventor of the patent claims.

overcome Leco's heavy burden of proof;[8] consequently, Flo–Con probably will be able to show the '908 patent is valid.

### B. The Remaining Preliminary Injunction Factors

■ Analysis of the remaining preliminary injunction factors—irreparable harm, balance of hardship between the parties, and injunction's impact on the public interest— suggests Flo–Con should be granted the limited relief described more fully below. In arguing these three factors, the parties understandably presumed that the potential relief at issue was an injunction against Leco's manufacture, use, promotion, and sale of allegedly infringing gates. Because of the parties relative positions in the market, the benefits of continued competition, and the sound financial condition of both parties, however, a more equitable form of relief is to require that Leco pay into the Court's registry a specified percentage of gross sales similar to those payments it would make under a license agreement. Under such an arrangement, neither party is irreparably harmed, because the funds paid into the registry of the Court will be held for disbursement to the prevailing party; any hardship such an arrangement places on Leco will be minor, because of its sound financial condition; and the public interest will be served by ensuring the continued benefits of healthy competition. Consequently, Flo–Con is entitled to limited injunctive relief against Leco's reversible and nonreversible gates.

### III. RELIEF

Although Flo–Con is entitled to relief under 35 U.S.C. § 283 for the reasons stated above, at this juncture its request that Leco be enjoined from manufacture, use, promotion, and sale of the allegedly infringing products overreaches necessity. Flo–Con and Leco are in direct competition, and, while the market may not be evenly split, each enjoys a substantial market share. As alluded to by Leco, even a temporary prohibition against Leco's allegedly infringing products would give Flo–Con a substantial competitive advantage extending beyond similarly the enjoined products. Such an injunction also would adversely affect Leco's standing in the market and, most significantly, deprive consumers of the benefits that flow from healthy competition.

A more workable solution than the blanket prohibition requested by Flo–Con is to require that Leco remit monthly payments to the registry of the Court similar to those it would make under a license agreement. Requiring the submission of such monthly payments assures compensation to Flo–Con if it prevails on the merits but avoids the problems associated with a blanket injunction— that is, it allows Leco to continue its presence in the marketplace and preserves the benefits of competition.

For this relief plan to serve its intended function, however, it must not distort the market. The plan's most likely source of market distortion arises from Leco's natural inclination to encourage the use of products that substitute for those subject to the payment requirements imposed by this Order. To prevent such actions, Leco's authority to manipulate the prices of and offer sales incentives for its tundish slide gates and slide gate accessories is restricted. As requested by Leco, however, Flo–Con is similarly restricted to prevent it from taking unfair advantage of Leco's lost marketing flexibility.

### IV. CONCLUSION

For the reasons explained above, it is hereby **ORDERED THAT LECO CORPORATION PAY INTO THE REGISTRY OF THIS COURT** and within the time period set forth below:

1. an amount equal to ten percent (10%) of its monthly gross sales of reversible tundish slide gates;

2. an amount equal to fifteen percent (15%) of its monthly gross sales of Flo–Con type nonreversible tundish slide gates; and

3. an amount equal to ten percent (10%) of its monthly gross sales of Groove type nonreversible tundish slide gates.

Leco Corporation **SHALL REMIT** payments for March, April, and May 1993 and every

---

8. *See supra* note 5 and accompanying text.

month thereafter until further ordered by this Court. Each month's payment **SHALL BE REMITTED** to the Clerk of Court by the close of business on the fifteenth day of the following month. If the fifteenth day of the month falls on a weekend or on a holiday observed by the Clerk of this Court, payment shall be due on the Clerk of Court's next business day.

**IT IS FURTHER ORDERED** that Leco Corporation is hereby **ENJOINED:**

1. from lowering the price of any reversible or nonreversible tundish slide gate below the lowest first quarter 1993 price charged for such gate;

2. in the case of any model of tundish slide gate not offered for sale in the first quarter 1993, from offering such gates for sale at a price below the lowest price of the most similar tundish slide gate for which a first quarter 1993 Leco Corporation price is available;

3. from lowering the price of any tundish slide gate accessories, including adapter assemblies for nonreversible tundish slide gates, below the lowest first quarter 1993 price charged for such accessories;

4. from offering new sales incentives for any tundish slide gates; and

5. from offering new sales incentives for any tundish slide gate accessories, including adapter assemblies for nonreversible tundish slide gates.

**IT IS FURTHER ORDERED** that Flo-Con Systems, Inc., is hereby **ENJOINED:**

1. from lowering the price of any reversible or nonreversible tundish slide gate below the lowest first quarter 1993 price charged for such gate;

2. in the case of any model of tundish slide gate not offered for sale in the first quarter 1993, from offering such gates for sale at a price below the lowest price of the most similar tundish slide gate for which a first quarter 1993 Flo-Con Systems, Inc., price is available;

3. from lowering the price of any tundish slide gate accessories, including adapter assemblies for nonreversible tundish slide gates, below the lowest first quarter 1993 price charged for such accessories;

4. from offering new sales incentives for any tundish slide gates; and

5. from offering new sales incentives for any tundish slide gate accessories.

**ORDER ENTERED.**