**The LAITRAM CORPORATION,**
**Plaintiff–Appellant,**

v.

**NEC CORPORATION and NEC**
**Information Systems, Inc.,**
**Defendants–Appellees.**

No. 94–1368.

United States Court of Appeals,
Federal Circuit.

Aug. 4, 1995.

Phillip A. Wittman, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, LA, argued for plaintiff-appellant. With him on the brief were Steven W. Usdin and William L. Geary, Jr. Also on the brief were Timothy J. Malloy, Lawrence M. Jarvis, Robert C. Ryan and Sharon A. Hwang, McAndrews, Hold & Malloy, Chicago, IL.

John M. Calimafde, Hopgood, Calimafde, Kalil & Judlowe, New York City, argued for defendants-appellees. With him on the brief was Marvin N. Gordon.

Before NEWMAN, Circuit Judge, COWEN, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

Laitram Corporation sued NEC Corporation and NEC Information Systems, Inc. for infringement of claims 1 and 2 of reexamined U.S. Patent No. B1 3,952,311 (the '311 patent). A jury found that NEC infringed both literally and under the doctrine of equivalents. The trial court then granted judgment as a matter of law (JMOL) that NEC did not infringe and overturned the jury's verdict. *Laitram Corp. v. NEC Corp.*, No. 89–CV–1571, slip op. at 1, 1994 WL 261966 (E.D.La. June 6, 1994) (Order). Because the trial court erred in granting JMOL, this court reverses and remands for reinstatement of the jury verdict.

## BACKGROUND

The '311 patent claims an electro-optical printer that prints letter quality, alpha-numeric characters on a photosensitive record-ing medium. Apparatus claim 1 and method claim 2 recite:

1. An electro-optical printing apparatus for printing type quality alpha-numeric characters at high speed on a surface of a photosensitive recording material, said apparatus comprising:

a plurality of rapidly reacting radiation emitters each being capable of emitting radiation at wavelengths to which said surface is sensitive, said emitters being disposed in an array along a substantially straight line, said array being a plurality of rows of said radiation emitters;

means for moving said recording material in a single direction substantially perpendicular to said straight line with its surface adjacent said array, and at a substantially constant speed relative to said array and;

means for selectively activating each of said emitters for predetermined periods of time, and

means for coordinating the predetermined period of time in which each of the said plurality of emitters are activated with said constant relative speed of said recording material so that the radiation emitted by said emitters will be recorded on selected areas of said recording surface in the form of an alpha-numeric image,

each of said emitters being positioned to irradiate a different area of said recording surface, the different areas of said surface irradiated by each of the said emitters being arranged in an overlapping relationship with one another and said plurality of emitters being of sufficient number to print said type quality alpha-numeric characters.

2. A method of electro-optically printing type quality alpha-numeric characters at high speed on the recording surface of a photosensitive material, said method comprising the steps of:

arranging a plurality of rapidly reacting radiation emitters in a straight line array, each of the said emitters being capable of emitting radiation at wavelengths to which said photosensitive material is sensitive,

selectively energizing for predetermined periods of time each of the said emitters,

transmitting the emitted radiation from each of the said emitters to a different area on said surface,

providing relative movement along a single coordinate substantially perpendicular to said array at substantially constant speed between said recording surface and said emitters, and

coordinating the predetermined periods of time in which each of said plurality of emitters is selectively energized with said constant speed of said relative movement between said emitters and recording surface so that alpha-numeric character images are recorded on said recording surface by exposure of selected areas of said recording surface by said emitted radiation, said step of coordinating including the steps of synchronously generating a first data signal which programs the order of energization of said emitters and a second data signal which determines the duration of the energization period of said emitters, and employing said first and second data signals to effect energization of said emitters so as to record said alpha-numeric character images of said type quality at said high speed.

(Emphasis omitted.)

During printing, photosensitive paper or other recording medium moves at constant speed past an array of light-emitting diodes (LEDs) in a direction perpendicular to the LED array. As the paper moves, the LEDs selectively activate (claim 1) or energize (claim 2) to expose, and thereby darken, stripes of varying lengths on the paper. These stripes form alpha-numeric characters, such as the "S" shown in Figure 1 of the patent.

To create the "S," the LEDs activate for variable periods of time, the activation period determining the length of a stripe.

The '311 specification discloses two ways to print a stripe during an activation period. In one embodiment, an LED corresponding

to the desired stripe location turns ON at the beginning of the activation period and remains continuously lit until the end of the period. The stripe thus printed combines with other stripes to form an alpha-numeric character. In a second embodiment, an LED rapidly turns ON and OFF, or strobes, during the activation period. The strobed LED activation method also produces solid stripes which form characters on the paper.

Laitram sued NEC for infringement of claims 1 and 2 of the '311 patent. NEC's accused printer produces letter quality, alpha-numeric characters on a photo-sensitive recording medium. As the recording medium moves past LEDs arranged in an array, the NEC printer selectively strobes the LEDs to print characters. Each strobe is of fixed duration. Oval-shaped marks produced by a strobed LED overlap to create a stripe. The stripe length varies depending on the duration of the strobing. The stripes form characters, such as the "S" shown in the trial exhibit offered by Laitram below.

Before trial, a third party requested reexamination of the '311 patent as originally issued based on newly cited prior art. The trial court stayed the case pending conclusion of the reexamination. During reexamination, Laitram amended and added claims. The reexamination, however, did not change the language of the claim limitations at issue in this case. When the Reexamination Certificate issued, the trial court reopened the case.

The parties introduced extensive evidence over a five-day jury trial. The trial court sent the issues of claim construction, infringement, willfulness, and damages to the jury with proper instructions. The jury rendered its verdict on claim construction and literal infringement in special interrogatory form, as excerpted below:

A. Do you find that the language in Claim 1 "means for selectively activating each of the emitters for predetermined periods of time" covers an LED printer in which the LEDs are turned ON on different occasions but on each occasion for a fixed period of time?

     yes   x      no _____

B. Do you find that the language in Claim 2 "selectively energizing for predetermined periods of time each of said emitters" covers an LED printer in which the LEDs are turned ON on different occasions but on each occasion for a fixed period of time?

yes    x    no _____

C. Do you find that the language in Claim 2 "a second data signal which determines the duration of the energization period of said emitters" covers an LED printer in which the LEDs are turned ON on different occasions but on each occasion for a fixed period of time?

yes    x    no _____

The jury found that NEC literally and willfully infringed and awarded Laitram a reasonable royalty.

After the jury verdict, NEC filed a JMOL motion challenging the jury's verdict of literal infringement. The trial court held that the jury erred as a matter of law in interpreting the claims and entered JMOL of noninfringement. *Laitram Corp.*, No. 89–CV–1571, slip op. at 1, 1994 WL 261966. Laitram appeals.

### DISCUSSION

### I.

■ When a party appeals from a trial court's post-verdict grant of JMOL, this court reviews the trial court's claim construction, a matter of law, *de novo*. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir. 1995) (*en banc*). The claim limitations at issue in this case are: (1) "means for selectively activating each of said emitters for predetermined periods of time" in claim 1, (2) "selectively energizing for predetermined periods of time each of the said emitters" in claim 2, and (3) "synchronously generating a first data signal ... and a second data signal which determines the duration of the energization period of said emitters" in claim 2. Both parties agree that the periods of activation (claim 1) or energization (claim 2)—the periods during which the printer prints a stripe—vary with the desired stripe length. The dispute in this case is whether the claim terms "selectively activating" in claim 1 and "selectively energizing" in claim 2 cover printing strobed stripes, or whether those claim terms encompass only printing continuous stripes.

■ In construing claim language, the court considers the claims at issue, the specification, and the prosecution history. *Markman*, 52 F.3d at 979 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561, 19 USPQ2d 1500, 1503 (Fed.Cir.1991)). The specification of the '311 patent discloses strobing the LEDs to print an exposed "region" or stripe:

> [T]he recording medium can be moved at a relatively slower speed such that each emitter can be *flashed or "strobed"* a selected number of times to expose a particular region to the radiant energy required to provide a predetermined density.

(Emphasis added.) Thus, the specification contemplates strobing during the variable periods of selective activation (as in claim 1) or selective energization (as in claim 2).

■ Dependent claims 4 and 27 confirm that "selectively activating" in claim 1 and "selectively energizing" in claim 2 cover strobing. Although each claim is an independent invention, dependent claims can aid in interpreting the scope of claims from which they depend. Claim 4 which depends from claim 3, in turn depending from claim 1, recites:

> 4. An electro-optical printing apparatus as recited in claim 3 further comprising means for flashing said emitters a number of times along said linear regions.

Claim 4 covers an embodiment of the invention recited in claim 1 where the printer flashes, or strobes, LEDs during the activation period to print "linear regions" or stripes. Claim 27, which depends from claim 2, recites:

> 27. A method of electro-optically printing alpha-numeric characters on the recording surface of a photosensitive material as recited in claim 2 wherein said step in which the emitters are selectively energized includes the step of strobing said emitters during the duration of the energization period.

Claim 27 makes clear that, in one embodiment of the invention recited in claim 2, strobing occurs during the energization period.

The prosecution history does not suggest a different result, moreover. During prosecution of the reexamination application, Laitram distinguished claim 2 from two prior art references. The first reference, United States Patent No. 3,085,132 to Innes (the Innes patent), discloses a dot matrix printer that forms alpha-numeric characters by marking distinct dots on a recording medium. For example, an "E" produced by the Innes printer appears below:

Laitram distinguished the Innes patent on the basis of the "fixed timing of the Innes dot matrix" and the Innes' "fixed-time-duration pulses":

> [I]n alleging that Innes in the "plot mode" operates in accordance with claim 2 ignores the claimed mode of operation which records *alpha-numeric character images* by means of second data signals that determine the duration of the energization period of the emitters coordinated by the constant speed movement along the Y axis as taught [by the '311 patent]. The character style S of Fig. 1 is unique to [the '311 patent] and goes contrary to the fixed timing of the Innes dot matrix.... [I]nnes teaches only a dot [point] mode for both alphanumeric and plot modes.... Further, it is clear from Innes ... that all marking is done with "fixed-time-duration" pulses, as contrasted to the claimed second data signal which determines the variable duration of [the '311 patent] line type marks.

(Emphasis in original.) Unlike the claimed printer, the Innes printer does not print *stripes* of varying length. Rather, the Innes printer produces distinct dots of fixed length by fixed duration pulses. Thus, this passage from the prosecution history does not define the relevant claim language of the '311 patent to mean something other than strobing during the activation period.

Laitram also distinguished United States Patent No. 1,201,624 to Baylis (the Baylis patent) from claim 2 of the '311 patent. The Baylis patent discloses an electro-optical printer that uses LEDs to record an image on a recording surface. Laitram explained a difference between the claimed printer and that disclosed in the Baylis patent:

> Nor is there anticipation of the step of "coordinating—including the step of synchronously generating *a second data signal which determines the duration of energization period* of said emitters" in view of the absence of Baylis of any teaching of determining the duration of or of coordi-

nating [Baylis'] continuously energized emitter 114 synchronously with any-thing.... [T]he Faraday *shutter* cells [of Baylis] are scanned and arranged to selectively gate light *one at a time ... "to build up from rows of spots images of the cells 111."* That passage does not anticipate or teach in any way the second data signal defined in Claim 2 of variable duration to effect energization of the plurality of emitters to form line images.... Thus, Baylis does not in the Fig. 2 embodiment anticipate the variable duration defined by the claimed step of "coordinating—a second data signal which *determines the duration of the energization period of said* emitters."

(Emphasis in original.) Again, this passage does not define the relevant claim language to exclude strobed striping. Laitram noted that the Baylis printer builds characters from rows of distinct spots. Laitram then pointed out that the Baylis patent does not teach synchronization of a plurality of emitters with the movement of a recording medium to form vertical line images or stripes. At no time during prosecution did Laitram represent that the relevant claim language could not embrace painting stripes by fixed-time strobing during variable periods of activation.

In sum, claims 1 and 2, as properly construed, cover both printing continuous and strobed stripes.

## II.

■■■ The trial court sent the issue of claim construction to the jury in the form of special interrogatories. Because claim construction is a legal issue within the sole province of the court, this court will treat the jury's claim construction as an advisory determination. In granting JMOL to NEC, however, the trial court ultimately construed claims 1 and 2 of the '311 patent, exercising its power and obligation to decide the meaning of the claims as a matter of law. *See Markman*, 52 F.3d at 979. This court now must determine whether the trial court's claim construction survives our *de novo* review.

The trial court began correctly by recognizing that the '311 patent claims a method and apparatus for activating LEDs for variable periods of time, depending on the desired stripe length. The trial court also correctly found that the claims "may allow flashing or strobing during the [activation] period." The trial court thus correctly construed the claims to cover variable activation periods and strobing during those variable activation periods.

Yet, the trial court inexplicably concluded that NEC's accused printers could not literally infringe the claims. The trial court held:

[T]he jury erred as a matter of law in interpreting the scope of claims 1 and 2 to cover an LED printer in which the LEDs are turned [ON] on different occasions but on each occasion for a fixed period of time. Because claims 1 and 2 cannot be interpreted to read on such a device, the jury's finding of literal infringement by the NEC printer cannot stand.

The trial court thus construed claims 1 and 2 not to cover strobed printing. This erroneous conclusion contradicts the trial court's own prior determination that claims 1 and 2 embrace strobing.

Claims 1 and 2, as properly construed in view of the specification, other claims, and prosecution history, cover LEDs which are strobed—each strobe of fixed duration—during variable periods of activation. To the extent the trial court found differently in granting JMOL, it erred.

Although claim construction is properly a matter of law for the trial court, this court notes that the jury applied the correct construction of the claims in reaching its infringement verdict. The jury found that claims 1 and 2 cover "LED printers in which the LEDs are turned ON on different occasions but on each occasion for a fixed period of time." The jury presumably read "ON" to refer to rapid ON–and–OFF strobing and properly construed the claims to cover LED printers which print with fixed pulse LED strobes during variable periods of activation. In other words, the jury could have read the special interrogatory to ask whether claims 1 and 2 cover "LED printers in which the LEDs are turned ON [i.e., strobed or

flashed] on different occasions but on each occasion for a fixed period [i.e., strobe or flash period] of time." The jury's affirmative response to this special interrogatory on claim construction is consistent with its infringement finding. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962).

### III.

█ It remains only to determine whether substantial evidence supports the jury's fact finding that NEC infringes claims 1 and 2 as properly construed. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992). Laitram presented substantial evidence from which the jury could reasonably find that NEC's accused printers infringed. Using a mechanical model to represent the electronics of an electro-optical printer, Laitram's expert, Mr. Prohofsky, demonstrated to the jury how such a printer prints stripes by strobing. Mr. Prohofsky also testified in detail about the operation of NEC's printer and compared the claims to circuit diagrams of NEC's printer and to its operation. Thus, substantial evidence supports the jury's finding of literal infringement. Because this court resolves the issues on appeal on literal infringement grounds, this court need not reach the issue of infringement under the doctrine of equivalents.

### CONCLUSION

The trial court erred in granting NEC JMOL and overturning the jury's infringement verdict. Therefore, this court reverses and remands with instructions to reinstate the jury's verdict.

### COSTS

Each party shall bear its own costs.

REVERSED AND REMANDED.